Neil MORRISON, Petitioner,

v.

Irwin I. KIMMELMAN, Attorney General of New Jersey; and John J. Rafferty, Superintendent, Rahway State Prison, Respondents.

Civ. A. No. 83–1428.

United States District Court,
D. New Jersey.

Jan. 30, 1984.

As Amended Feb. 2, 1984.

Sweeney, Bozonelis, Staehle & Woodward by William E. Staehle, Chatham, N.J., for petitioner.

Irwin I. Kimmelman, Atty. Gen. of N.J. by Arlene R. Weiss, Deputy Atty. Gen., Div. of Crim. Justice, Appellate Section, Trenton, N.J., for respondents.

## OPINION

STERN, District Judge.

In this petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, petitioner Neil Morrison challenges the constitutionality of his confinement at New Jersey State Prison at Rahway on three grounds.[1] First, petitioner contends that the warrantless search of his apartment and seizure of certain evidence submitted at trial by the prosecution violated his fourth and fourteenth amendment rights. Second, petitioner maintains that his attorney's failure to make a timely demand for discovery and a timely suppression motion at trial deprived petitioner of his right to effective assistance of counsel. Third, petitioner argues that the legal standard for ineffective assistance of counsel relied on by the New Jersey State courts in disposing of his appeal is unconstitutional. Respondents move to dismiss the petition on the ground that petitioner has failed to exhaust his state court remedies as required by 28 U.S.C. § 2254(b). For the reasons that follow, we will deny respondents motion to dismiss and grant the writ of habeas corpus.

## FACTS

On March 14, 1978, a four-count indictment was brought against petitioner Morrison, consisting of counts of carnal abuse, forcible rape, impairing the morals of a child and private lewdness, all in connection with the alleged rape by Morrison of a 15 year old girl who worked for him. Morrison waived his right to a trial by jury, and in March, 1979, a bench trial took place

---

1. At the time the petition was filed, petitioner was unrepresented by counsel. By the Court's Order of October 4, 1983, an attorney was appointed pursuant to 18 U.S.C. § 3006A(g) to represent petitioner in this action.

over six days. The State's case consisted of testimony by the victim and her mother, as well as scientific evidence attempting to establish that Morrison had committed the rape. The victim testified that she had worked after school at Morrison's fish store, and that on the day in question, Morrison had asked her to accompany him on several deliveries. She stated that after stopping at a few bars, Morrison drove her to his apartment, where, after forcing her onto his bed, he raped her. The victim testified that Morrison then drove her home. After she eventually told her mother what had happened, the victim stated, her mother called the police who came and took her to the hospital. At the hospital, various studies were performed, including vaginal washes used to detect the presence of sperm. After being examined, the victim went with Paterson Police Detective Dolores Most and two other police officers back to Morrison's apartment. It was the victim's testimony that Detective Most remained at the apartment, and that she was accompanied home by another police officer.

The State called the victim's mother, who testified that after her daughter told her of the rape, the mother retrieved her daughter's underpants, which she said felt sticky, and later gave them to the police. Police Officer Talarico testified that he took the underwear and delivered it to the Police Laboratories.

Detective Most took the stand and testified that she had gone to Morrison's apartment with the victim, where they were let in by Wesley Harris, a friend of Morrison who lived in the same building. Most stated that she had photographs taken of the apartment, and that she then took the sheet from Morrison's bed. At this point in the testimony, defense counsel objected, stating that unless Most had had a search warrant or some other justification for taking the sheet, the testimony regarding the sheet, and the sheet itself, could not be offered in evidence. It soon became clear, however, that defense counsel had failed to request discovery prior to trial, and as such, was unaware that the search had

taken place and that the State was in possession of the sheet. Because of the failure to conduct discovery, defense counsel had not been able to timely move to suppress the evidence prior to trial, pursuant to New Jersey Court Rule 3:5–7(a). The court, while stating that had a motion been timely made there would have been a "very valid basis for suppression", nonetheless held that defense counsel could no longer make such a motion since trial had begun. The court criticized defense counsel for having been remiss in failing to request discovery, noting that at least two reports—a chemical analysis of the bedsheet ordered by the State, and a police report prepared by Most—clearly indicated that the State had Morrison's sheet in its possession. Defense counsel's objection was overruled, and Most stated that the sheet, which had some stains and hairs on it, was sent to the Police Lab.

The State then called a number of witnesses who had performed various lab studies on the stains and hairs found on the sheet, on blood and hair exemplars provided by the victim and Morrison, on the victim's underwear, and on the victim's physical examination results. These lab technicians collectively established that: stains on the seized bedsheet were positive for sperm from a man of blood type "O"; stains on the victim's underwear were positive for sperm from a man of blood type "O"; some of the vaginal tests performed at the hospital showed the presence of sperm; Morrison's blood type is "O"; and hairs recovered from the bedsheet were similar to head hair of both Morrison and the victim.

The defense called four witnesses and the defendant himself, who developed a different version of the facts. It was defendant's testimony that he owed money to the alleged victim, and that she and her mother had been persistently demanding that she be paid. Morrison stated that on the day in question, he had been unable to pay his employee since the store had been robbed the night before (this testimony was corroborated by Mack Ross, co-owner of

the fish store), so he went to make collections—not deliveries—from three bars that owed the store money. Defendant testified that the purported victim insisted on going with him to collect. After all three bars were unable to pay him any money, according to Morrison, the two of them went to Morrison's apartment building to collect rent money that Morrison was owed from some tenants to whom he rented apartments. He testified that the girl went up to his room, that she sat on his bed, that he tried unsuccessfully to collect money from his tenants, and that they then returned to the store. Wesley Harris, friend and purported lessee of Morrison, had earlier testified that he was present in the room with Morrison and the victim for nearly the entire time that the two were in the building. Morrison also stated that he had had sex with women, other than the victim, on the bed, and that Mack Ross would on occasion use his room and bed for a "sexual outlet". According to Morrison, the alleged victim went home, and her mother later told Morrison that she would "fix him" for not paying her daughter. Morrison stated that subsequent to charges being filed, the mother had on various occasions indicated that she would drop them. Morrison said that on the Sunday before the trial began, he met with her and the victim at the mother's home, at which time the mother again suggested that she was no longer interested in the prosecution going forward. Morrison also reported that the victim admitted at this meeting that he had not raped her, and stated that she had been afraid that her mother would find out about the fact that she had been having sex with her boyfriend, also the father of her child.[2]

Defense counsel's summation dwelled largely on inconsistencies in the victim's testimony. Counsel also raised questions about the mother's admitted meeting with Morrison on the day before the trial began, suggesting that if the mother and the victim believed the rape had occurred, it would be odd behavior to meet calmly with the defendant in their own house on the eve of trial. Finally, defense counsel discredited the significance of the scientific evidence, noting that the expert witnesses had admitted that the test results provided no positive identification beyond matching blood type, nor could they pinpoint when various events had happened.

The State's summation stressed that credibility was the key to the outcome of the case, noting that the judge's findings in this respect would turn on the witnesses' testimony, the "supportive" scientific evidence, and common sense. The State analyzed the perceived weaknesses in the testimony of each of the defense's five witnesses, and then discussed the scientific evidence. The State recalled that the victim's underpants were reportedly sticky after the alleged rape had occurred, and that the stains on the bed were from a man of the same blood type as defendant. Because the vaginal washes had demonstrated the presence of sperm, the State maintained that defendant could only argue that the victim had had sex with her boyfriend on the day in question, but noted that the defense had not called the boyfriend to testify nor had him tested for blood type. In concluding, the State contended that common sense precluded a finding of innocence, for if Morrison's story were correct, it would make no sense for the victim and her mother to frame Morrison by a fabrication that placed the rape in a room where another witness (Harris) had been present.

After a recess, the judge returned and said: "I guess, gentlemen, that since I'm judge and jury and if I were to render a decision as you would get it from the jury, you would get a cut and dried answer of guilty or not guilty. But I think you're entitled to some of my observations before I give you the bottom line." The judge noted that there were discrepancies in both cases, but, after outlining the respective difficulties, the judge found that the incon-

**2.** Earlier in the trial, the victim's mother had admitted on cross-examination that this meeting had taken place.

sistencies in the defense's case outweighed those in the State's. After finding favor with the State's "common sense" argument, the judge stated in closing: "I won't comment anymore upon the testimony, gentlemen. But it's my opinion that the State has proven its case beyond a reasonable doubt, and it's my finding that the defendant is guilty [on all four counts]." The judge did not discuss the scientific evidence. Morrison was sentenced to eight-to-ten years for the rape conviction; sentences on the other counts were shorter and made concurrent with that imposed for the rape conviction.

In appealing his conviction to the New Jersey Superior Court, Appellate Division, petitioner raised three arguments: (1) that the convictions should be merged since all four were based on a single criminal transaction; (2) that defense counsel's failure to make a timely demand for discovery and a timely suppression motion had deprived petitioner of his right to effective assistance of counsel and (3) that the trial court had erred in refusing to conduct a hearing to determine the legality of the search of petitioner's apartment and the seizure of his bedsheet. The Appellate Division held that petitioner had failed to demonstrate that his attorney's inadequacy was of "such magnitude as to thwart the fundamental guaranty of a fair trial." *State v. Edge*, 57 N.J. 580, 593, 274 A.2d 42 (1971). The Appellate Division then dismissed as "clearly without merit" petitioner's contention that the trial judge had erred in refusing to grant a suppression hearing. Petitioner's final argument, that all four convictions should be merged, was accepted by the court. Finding that all charges arose from a single criminal transaction, the Appellate Division consolidated the convic-

tions for carnal abuse, impairing the morals of a child, and private lewdness with the rape conviction. Accordingly, the convictions and sentences for the three lesser offenses were vacated. *State v. Morrison*, A-4157-78 (App.Div., Mar. 18, 1981).

In his petition for certification to the New Jersey Supreme Court, petitioner denominated two arguments: first, that he was deprived of the effective assistance of counsel, and second, that the standard for ineffective assistance of counsel used by the Appellate Division is unconstitutional.[3] His petition was denied by the Supreme Court in May of 1981. *State v. Morrison*, 87 N.J. 368, 434 A. 1056 (1981).

Over a year later, petitioner filed a petition for postconviction relief with the Superior Court of New Jersey, Law Division. Petitioner again raised the issue of ineffective assistance of counsel, and challenged the trial court's failure to hold a suppression hearing or to exclude the evidence obtained during the search. Because these issues had been expressly adjudicated on direct appeal, the petition was denied pursuant to New Jersey Court Rule 3:22-5.

Petitioner filed this petition for a writ of habeas corpus in late April of 1983, raising three arguments: (1) that he was denied effective assistance of counsel at trial in violation of his sixth and fourteenth amendment rights; (2) that New Jersey's standard for ineffective assistance of counsel is unconstitutional; and (3) that the warrantless search of petitioner's apartment and seizure of his bedsheet violated petitioner's fourth and fourteenth amendment rights. Respondent moves to dismiss the petition on the ground that petitioner has failed to exhaust his state court remedies as required by 28 U.S.C. § 2254(b).

---

**3.** While petitioner's certification petition identified only these two "points" as argument headings, within "Point One"—titled "Petitioner Was Denied Effective Assistance of Counsel"—petitioner stated:

> Petitioner, at trial, was entitled to the constitutional guarantees of a fair trial, effective assistance of counsel and the exclusion of evidence seized from him in violation of the Fourth Amendment to the United States Con-

stitution. *U.S. Const. Amend* 4 and 6; *N.J. Const. Art.* 1, par. 10; *State v. Whitlow*, 45 N.J. 3, 27 [210 A.2d 763] (1965); *State v. Mingo*, 77 N.J. 576, 581 [392 A.2d 590] (1978). Certification Petition at 4. For reasons stated below, see *infra* at 802 & n. 5, while it appears that the certification petition did raise the fourth amendment issue, we need not resolve this question.

## DISCUSSION

### 1. *Exhaustion*

 The exhaustion doctrine set forth in 28 U.S.C. § 2254(b) provides that a federal court shall not grant a state prisoner's petition for habeas corpus unless he has fully exhausted all state judicial remedies. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Jones v. Superintendent of Rahway State Prison*, 725 F.2d 40 at 42 (3d Cir.1984); *Santana v. Fenton*, 685 F.2d 71, 73 (3d Cir.1982). The exhaustion requirement is met either when the petitioner's federal claim has been fairly presented to the highest available state court, or when a means by which the petitioner can reasonably present a claim no longer exists. *United States ex rel. Geisler v. Walters*, 510 F.2d 887, 892 (3d Cir.1975). Unless all claims brought before the court have been exhausted, the entire petition must be dismissed. *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982).

Respondents contend that petitioner has not exhausted his state judicial remedies with regard to any of his claims. Specifically, it is argued that petitioner's failure to appeal the denial of post-conviction relief to the Appellate Division or State Supreme Court leaves unexhausted petitioner's claims of ineffective assistance of counsel and violation of his fourth amendment rights. Respondents' brief at 7. Respondents further argue that petitioner's claim challenging the constitutionality of the standard for ineffective assistance of counsel applied by the state courts is unexhausted because petitioner never presented it to the Appellate Division or in the post-conviction relief proceeding. *Id.* at 6. We find that respondents' arguments misrepresent exhaustion doctrine and, as a result,

misconstrue the relevant events in this case.

██ ██ Respondents incorrectly state that all avenues of post-conviction relief must be exhausted before a claim is cognizable in a habeas corpus petition. In fact, once a claim has been directly appealed to the state's highest court, it will be considered to be exhausted, even if no post-conviction relief is sought. *United States ex rel. Hickey v. Jeffes*, 571 F.2d 762, 764 (3d Cir.1978); *see Jones*, No. 83–5277 slip op. at 4 (one opportunity for state courts to consider claim is sufficient for exhaustion). There is no dispute that petitioner fairly presented his claim for ineffective assistance of counsel to both the Appellate Division and the New Jersey Supreme Court. Regarding petitioner's claims that the New Jersey standard for measuring effective assistance of counsel is unconstitutional, we do not view this argument as independent from petitioner's broader sixth amendment claim of ineffective assistance of counsel. Rather, we consider the former claim to be subsumed in the latter argument: that petitioner was deprived of the effective assistance of counsel as measured by a federal constitutional standard. Since our inquiry into petitioner's claim of ineffective assistance of counsel is of course controlled by federal interpretation of sixth amendment requirements, it would not be necessary to pass on the constitutionality of New Jersey's standard for determining the effectiveness of counsel. To the extent that these arguments merge, therefore, we find that petitioner clearly exhausted his claim of ineffective assistance of counsel.[4]

██ Finally, with respect to petitioner's claim that his fourth and fourteenth amendment rights were violated by the warrantless search and seizure of the bedsheet, which was subsequently admit-

---

**4.** Even were we to consider these arguments as separate, we have no doubt that petitioner in fact exhausted both. In his brief to the Appellate Division, petitioner urged the court to apply the standard for determining effective assistance of counsel announced in *State v. Anderson*, 117 N.J.Super. 507, 519, 285 A.2d 234 (App.Div. 1971) ("normal customary skill and knowledge" standard), as opposed to that enunciated in *State v. Edge*, 57 N.J. 580, 593, 274 A.2d 42 (1971) ("farce or mockery" standard). Defendant's Brief at 16–17. While the *Anderson* formulation is the same as that applied by the Third Circuit, *United States v. Swinehart*, 617 F.2d 336, 340 (3d Cir.1980), the Appellate Division chose to follow *Edge*.

ted into evidence, we find that we are precluded from considering this claim under the doctrine established in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In *Stone,* the Court ruled that "where the State has provided an opportunity for full and fair litigation of a fourth amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." *Id.* at 494, 96 S.Ct. at 3052. Petitioner has not argued that he was denied an opportunity to litigate fully and fairly his fourth amendment claim, nor does the record in any way support such a contention. To the contrary, petitioner has argued that his counsel simply failed to utilize the available means for challenging unlawfully obtained evidence. Thus, we conclude that petitioner's fourth amendment claim is plainly not cognizable as a basis for habeas corpus relief. As such, § 2254 is inapplicable and there is no need to inquire whether petitioner exhausted this claim before the state courts. *See Engle v. Isaac,* 456 U.S. 107, 120 n. 19, 102 S.Ct. 1558, 1567 n. 19, 71 L.Ed.2d 783 (1982).[5]

In sum, we find that petitioner has exhausted all claims which afford a ground for habeas corpus relief. Accordingly, the State's motion to dismiss will be denied.

### 2. The Merits

■ To prevail on this petition for a writ of habeas corpus, Morrison must show that he was deprived of the effective assistance of counsel and that he was thereby prejudiced. *United States v. Baynes,* 687 F.2d 659 (3d Cir.1982). To establish ineffectiveness, it must be clear that petitioner's attorney did not exercise "the customary skill and knowledge which normally prevails at the time and place." *Moore v. United States,* 432 F.2d 730 (3d Cir.1970); *accord Baynes,* 687 F.2d at 665; *United States v. Swinehart,* 617 F.2d 336 (3d Cir.1980). Application of this standard "entails a careful inquiry into the particular circumstances surrounding each case," *Baynes,* 687 F.2d at 665; moreover, impressive performance by an attorney at trial will not excuse insufficient pretrial investigation and preparation. *Moore,* 432 F.2d at 739.

We come quickly to the conclusion that petitioner's trial counsel was ineffective under the standard announced in *Moore.* Put simply, counsel failed to conduct any meaningful pretrial discovery, and thus was totally unaware that certain damaging evidence might have been the appropriate subject for a suppression motion. Counsel seems to have acted on the misapprehension that the State was obligated to turn over anything that the defense might be interested in examining. Little else was offered by way of excuse by petitioner's lawyer in the face of repeated criticism by the state trial judge, except for counsel's rather remarkable attempt to justify his conduct by noting that up until trial he had been told that the victim "didn't want to go ahead with this case." *See* Transcript of March 14, 1979, 102–115. The state trial judge recognized that there was a very valid basis for suppression, and we cannot conceive of any legitimate claim that the search and seizure was constitutional.[6] Based on the unmitigated negligence of petitioner's trial counsel in failing to conduct any discovery, combined with the likelihood of success of a suppression motion had it been timely made, we find that peti-

---

5. Although we decline to apply traditional exhaustion analysis to petitioner's fourth amendment claim as a basis for decision, were we to do so we would most likely find that this claim was exhausted below. *See, supra* at n. 3. Respondents concede that the fourth amendment claim was presented to the Appellate Division and the New Jersey Supreme Court. Respondents' brief at 7.

6. At oral argument on the present petition, counsel for the State admitted that on the record before the Court there was no apparent justification for the search and seizure. *See* Transcript of December 20, 1983, 11–12.

tioner was deprived of effective representation.[7]

■ We arrive at our conclusion that this ineffective representation prejudiced petitioner with only slightly more difficulty. Prejudice is to be measured under the harmless error doctrine, for, as announced in *Baynes*, 687 F.2d at 670–71 (emphasis in original):

> [A]ny substantial doubt must be resolved in favor of the defendant, inasmuch as *Chapman* [*v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ] permits a finding of harmless error only where it is concluded *beyond a reasonable doubt* that no prejudice resulted from the identified constitutional violation .... In other words, [a petitioner] need only demonstrate that his attorney's ineffectiveness was not harmless "beyond a reasonable doubt."

We cannot conclude that the failure of petitioner's lawyer to make a timely motion to suppress was harmless beyond a reasonable doubt. The evidence in this case was not overwhelming—the trial judge noted that there were inconsistencies with both the State's and defendant's cases. While there is no question that the credibility of the witnesses was of great significance, the State clearly viewed the "scientific" evidence as an important part of its case. In the State's opening argument, it stated that the scientific evidence would have "a strong bearing on the Court's decision as to guilt or innocence", and in its summation, the State asked the judge to assess credibility, in part, by considering the "supportive facts" produced in the form of the scientific evidence. Apart from the State's own evaluation of the case, it is hard to under-

estimate the significance in a rape case of a sheet, taken from the defendant's own bed within a short time after the alleged rape occurred, which has semen stains matching defendant's blood type and hairs matching the head hair of both defendant and the victim.

■ The State argues that the introduction of the sheet, and evidence obtained therefrom, was not prejudicial because it was petitioner's own sheet, and any stains or hairs linked to him would only corroborate the obvious; with regard to the hairs recovered from the sheet and linked to the victim, the State claims that this only established that the victim was at some point on petitioner's bed, a fact that petitioner admitted at trial. We must reiterate, however, that in order to find prejudice we need not determine that the evidence derived from the sheet constituted the basis for the finding of guilt; rather, we need only decide that its admission was not harmless beyond a reasonable doubt. The mere fact that defendant had some explanation for the damaging circumstantial evidence—for example, that both he and his friend Ross had had sex with other women on the bedsheet, or that the victim was, in fact, on his bed on the day in question— does not detract from our conclusion that the sixth amendment violation was not harmless. Had the evidence derived from the sheet been suppressed, it may well be that defendant would not have felt the need to offer these explanations. In short, without the direct circumstantial evidence the sheet provided, evidence that the victim was on a bedsheet containing semen stains of the defendant, the trial would be a different one than that which resulted in peti-

---

**7.** We are aware that there is not complete uniformity among the circuit courts as to the proper standard by which to measure effectiveness of representation, *see generally Romero v. United States*, 459 U.S. 926, 103 S.Ct. 236, 74 L.Ed.2d 187 (1982) (White, J., dissenting from denial of certiorari) (canvassing cases), and that the Supreme Court may soon resolve the issue. *See Washington v. Strickland*, 693 F.2d 1243 (5th Cir.1982), *cert. granted*, ——— U.S. ———, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). Even were we to adjudge this case under the most limited sixth amendment standard of review currently

in use—the "farce and mockery" standard, *see United States v. Wight*, 176 F.2d 376, 379 (2d Cir.1949), *cert. denied*, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950)—we would be constrained to find that petitioner had been deprived of the effective assistance of counsel, and conclude that those courts utilizing this standard would come to the same result. *See United States v. Aulet*, 618 F.2d 182, 187–88 (2d Cir.1980) (failure to make pretrial motions may, where there is a high likelihood of success, constitute ineffectiveness under "farce and mockery" standard).

tioner's conviction. Under such circumstances, there is at least a reasonable doubt that the constitutional error was harmless.

Finally, the State makes much of the fact that the state trial judge, in announcing his findings, made no mention of the sheet, or of any of the evidence obtained from the sheet. Recognizing the deference that is to be given state court findings of fact in a subsequent habeas proceeding, *see generally Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (state court factual determinations to be given "presumption of correctness"), there is no basis for concluding in this situation that the "findings" made by the state trial judge represented the complete factual underpinning for his ultimate finding of guilt. To the contrary is the judge's own characterization of his findings as simply "some of my observations before I give you the bottom line." After discussing some of the testimony in the case, the judge interrupted himself, stating "I won't comment anymore upon the testimony, gentlemen." The obvious inference to be drawn from this last statement is not that the undiscussed testimony played no part in the judge's decision, but merely that it would remain just that: undiscussed. We do not believe that because the trial judge chose to share some of his thoughts with the parties, that petitioner should thereby be foreclosed from claiming prejudice in the absence of an explicit reference by the judge to the otherwise damaging evidence.

In sum, we find that petitioner was deprived of his sixth amendment right to the effective assistance of trial counsel, and that this deprivation constituted error that was not harmless beyond a reasonable doubt. Accordingly, petitioner is entitled to a new trial. The writ of habeas corpus will be granted.

Finally, we are appreciative of the efforts of Mr. William Staehle, who was appointed by the Court to represent Mr. Morrison, and whose work was of the highest quality.

ORDERED that a writ of habeas corpus issue for Neil·Morrison, releasing him from all restraints and custody of the State of New Jersey in connection with the rape conviction of March 20, 1979, including but not limited to fines and parole requirements, unless the State of New Jersey begins proceedings for retrial within ninety (90) days hereof.